**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

DANIEL LA HART and    )
KATHERINE LA HART, individually )
and on behalf of those similarly situated, )   CIVIL ACTION
           )
  *Plaintiffs*,      )   No. 25-2072
           )
  v.        )
           )
SUNOCO PIPELINE L.P.,   )
ENERGY TRANSFER LP, and  )
ENERGY TRANSFER (R&M) LLC )
           )
  *Defendants*.    )

**<u>AMENDED CLASS ACTION COMPLAINT</u>**

## I.    **INTRODUCTION**

1.      Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Class Action Complaint against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP, and Energy Transfer (R&M), LLC (collectively, "Defendants"), alleging that Defendants' reckless, negligent, and irresponsible ownership, oversight, operation, supervision, maintenance, and control of a hazardous petroleum pipeline (the "Twin Oaks Pipeline" or the "Pipeline") has resulted in a massive and still unquantified leak of jet fuel and other petroleum products, along with resulting toxins, pollutants, and contaminants (the "Pipeline Leak" or "Leak"), in Upper Makefield Township, Pennsylvania.

2.      Defendants' conduct in allowing the Pipeline Leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the Leak.

3.      It has been reported that Defendants already have the worst record for fuel spills in the United States before this latest disaster. That record is now even worse, as Defendants have caused serious physical and financial harm to a beautiful suburban neighborhood.

4.      The Leak arises from a crack in the Pipeline, causing a discharge into the underlying bedrock and groundwater of jet fuel, other unidentified petroleum products, and other hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

1

These are substances so dangerous that their presence in the soil, water, and air presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

5.      Defendants' Pipeline Leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The Pipeline Leak has uprooted the affected community and has already caused certain residences within the community to be unlivable, amounting to an effective taking of family homes by Defendants.

6.      The physical harm to person and property that has been wrought by the Leak is palpable and concrete. As a direct result of the Leak, Plaintiffs now live on contaminated property and above a contaminated aquifer that provides them and the proposed Class with their drinking water. This existing contamination, coupled with the significant risk that further contamination will continue to accrue on Plaintiffs' property, has ruined enjoyment of their property, has damaged the property's value, and at least some and potentially all of that damage is permanent.

7.      In the weeks and months since Defendants finally revealed the Leak, home values throughout the Mt. Eyre Manor community and surrounding neighborhoods have plummeted. To date, not a single public home sale has closed in the Mt. Eyre Manor community since the Leak was disclosed, despite numerous homes being on the market in what was previously a highly sought-after neighborhood. Homeowners have been forced to repeatedly lower list prices and make other concessions after the existence of the Leak utterly devastated any interest from prospective home buyers.

8.      One home in the Mt. Eyre Manor community has been sold since the Leak, but *not* to a prospective home buyer: the residential well was so contaminated that *Defendants themselves* purchased it for the purpose of drilling monitoring and/or recovery wells, right in the middle of

the neighborhood. This highly contaminated suburban residential home that Defendants now own (despite being for-profit oil companies) is just two doors down the road from Plaintiffs' home.

9.      Testing has confirmed that Defendants' released jet fuel and unidentified other petroleum products, along with other and related pollutants, has contaminated private wells in the affected community, including Plaintiffs' well, that provide water for drinking, bathing, cooking, and washing. Testing also shows elevated levels of toxins in the air in certain houses in the impacted community, including one with benzene multiple times the statewide health standards.

10.     Defendants' conduct has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

11.     The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood that had strong property values and has been sought-after as an idyllic and wonderful place to live and raise a family.

12.     One of the notable features of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

13.     Indeed, Mt. Eyre Manor and other Upper Makefield residents have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

14.     As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant

contamination to the aquifers under the Mt. Eyre Manor community and surrounding neighborhoods, creating critical health and safety risks to the residents who live there, and causing other consequential harms as detailed herein.

15.    Defendants control and operate the Twin Oaks Pipeline and are responsible for maintaining the Pipeline and ensuring its safety. Defendants entirely failed to uphold that responsibility.

16.    Defendants' Pipeline Leak was confirmed on January 31, 2025. Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – *16 months* earlier – but utterly failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

17.    Despite receiving numerous complaints from alarmed residents about strange odors since at least September 2023, Defendants failed to properly act for at least over 16 months. Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and still to this day have not disclosed the full extent of the disaster.

18.    The full magnitude of the Pipeline Leak remains unknown and undisclosed. Defendants still cannot account for or are choosing not to publicly state how much toxic petroleum product has spilled, exactly what leaked, or where it is moving, nor can they guarantee that the Twin Oaks Pipeline is safe, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

19.    Numerous residents already have confirmed contamination within their private wells and well water, including Plaintiffs, which contamination is not disputed by Defendants who

have already publicly stated that the Pipeline Leak is their fault. The test results confirming contamination of Plaintiffs' water come from Defendants' own agents.

20.    One household across the street from where the Pipeline Leak was eventually discovered had approximately *fifteen gallons* of free jet fuel product found flowing on top of the water in their private well, and petroleum product has continued to significantly accrue at this home every day for the past *four months*. Indeed, as recently as today, June 4, 2025, the PADEP noted 0.5 feet of new product in the well. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel, and/or other petroleum products and constituents in their private wells.

21.    As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination are within and will remain within a zone of danger where contamination could be mere weeks or days away, and therefore are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

22.    Recent testing has now also confirmed that vapors from the contaminated groundwater has invaded homes in the neighborhood placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

23.    With no clear answers, no relief in sight, water in the underground aquifer and bedrock, private wells that have been contaminated, soil that has been contaminated, air that has been contaminated, property values plummeting, odors of jet fuel contamination within homes and in the neighborhood, and the prospect of having ingested, bathed, and used contaminated well water, the residents of Mt. Eyre Manor and the surrounding neighborhoods are left to grapple with

the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink, and concerned for their future safety from disease.

24.    This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members for which Defendants must be held accountable.

## II.    PARTIES

25.    Plaintiffs Daniel La Hart and Katherine La Hart reside in the Mt. Eyre Manor neighborhood at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

26.    Defendant Sunoco Pipeline L.P. ("SPLP") is a limited partnership formed under the laws of Texas. SPLP contends that it maintains a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. SPLP also maintains addresses at 535 Fritztown Road, Sinking Spring, PA 19608 and 3807 West Chester Pike, Newtown Square, PA 19073.

27.    Defendant Energy Transfer LP is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

28.    Defendant Energy Transfer (R&M), LLC is a limited liability company formed under the laws of Pennsylvania with a principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania 19103.

29.    Defendants John Does 1-100 (the "John Doe Defendants"), are persons or entities that are responsible for the conduct and/or injuries alleged in this Complaint, and accordingly are liable for the relief sought. Their identities are currently unknown to Plaintiffs, who consequently sue the John Doe Defendants by their fictitious names, but the John Doe Defendants will be ascertained through investigation and discovery. Plaintiffs will seek leave to amend this Complaint

to state the true names and capacities of the fictitiously named John Doe Defendants when they have been ascertained.

### III.    JURISDICTION AND VENUE

30.    Defendants removed this civil action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiffs have moved to remand the action to the Philadelphia County Court of Common Pleas based on the "local controversy" exception to CAFA.

31.    This Court has personal jurisdiction over each of the Defendants because they purposefully availed themselves of the privilege of conducting business in Pennsylvania and Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak from Defendants' Pipeline which occurred in Upper Makefield Township, Pennsylvania.

32.    Defendants contend that venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiffs contend that while that is true, venue is proper in Plaintiffs' chosen forum in the Philadelphia County Court of Common Pleas.

### IV.    FACTUAL ALLEGATIONS

#### A.  Defendants' History of Leaking Pipelines and Failures to Report

33.    Defendant Energy Transfer LP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendant Sunoco and Defendant Energy Transfer (R&M), LLC, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

34.    Energy Transfer LP primarily operated in the natural gas sector prior to its acquisition of Sunoco, and Sunoco's significant oil and petroleum product assets, in 2012.

Together, Defendants now own and operate over 125,000 miles of pipelines across the United States.

35.     Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

36.     According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.[1]

37.     Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

38.     Between 2002 and 2017, PHMSA issued 106 safety violations to Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.[2]

39.     These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

40.     Federal regulators have not deterred Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe. In 2022, SPLP and affiliate ETC Northeast Pipeline LLC were convicted by the Commonwealth of

---

[1] Exhibit A, Oil and Water: ETP & Sunoco's History of Pipeline Spills, Greenpeace USA and Waterkeeper Alliance (Apr. 17, 2018).
[2] Exhibit A (summarizing PHMSA records).

Pennsylvania of *57 charges* of criminal conduct associated with the construction and operation of two other pipelines Pennsylvania. The Commonwealth of Pennsylvania convicted Defendants on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent testing in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

41.    48 of the 57 criminal charges related to Defendants' conduct during the construction of the Mariner East 2 Pipeline, which crosses 17 counties in the southern tier of Pennsylvania, while the other 9 charges related to Defendants' conduct during the construction of the Revolution Pipeline, a 42.5 mile pipeline that starts in Butler County, and is routed through Beaver and Allegheny counties, and connects to a gas processing plant in Washington County.

42.    In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that Sunoco Pipeline LP was responsible for spilling over 1,400 barrels of fuel in 2024 alone, and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report. [3]

43.    The Twin Oaks Pipeline Leak demonstrates that Defendants are not forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

44.     Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines, and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

**B.      Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

45.     Defendants own and operate the Twin Oaks Pipeline, a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

46.     The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

47.     National Tube Supply Company manufactured the Pipeline.

48.     As originally installed, the Twin Oaks Pipeline was 8 inches in diameter and ran through a different trench than its current pathway under the Mt. Eyre Manor neighborhood. At the time, this 8-inch pipeline ran under farmland that existed prior to the development of the neighborhood:



49.    The above photo (Figure 1) is taken from Defendants' Interim Remedial Action Plan submitted to the PADEP on March 19, 2025. It depicts both the original 8-inch pipeline trench with its more directly diagonal northeasterly pathway and the more recent 14-inch pipeline trench, which abruptly turns north as it reaches the Mt. Eyre Manor neighborhood, then curves east, before ultimately resuming its diagonal northeasterly pathway.

50.    This alternate trench path around what is now the Mt. Eyre Manor neighborhood closely tracks the modern Glenwood Drive, as depicted below, and the abrupt turn northwards onto what is now Glenwood Drive matches the exact point at which the Leak was detected at 121 Glenwood Drive:

11

Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive, and the later-discovered Leak location indicated with a blue star.

51.    On a daily basis, Defendants move massive quantities of petroleum products through the Pipeline, at pressures over 1000 psi, under the Mt. Eyre Manor community and surrounding neighborhoods. This product runs up against the abrupt northward turn at 121 Glenwood Drive with significant force.

52.    On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).

created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots.

53.    Despite this Advisory Bulletin, Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.[5]

54.    Furthermore, the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical, without limitation, to public safety.

55.    Despite this knowledge, Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

56.    The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures.

---

[5] Exhibit B, Letter from U.S. Representative Brian K. Fitzpatrick to Acting Administrator Ben Kochman (March 11, 2025).

57.     On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

58.     On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

59.     Defendants also renovated a major portion of the Twin Oaks Pipeline—the portion that crosses the Delaware River, right next to the residential Mt. Eyre Manor neighborhood—in June and July 2023. Defendants installed approximately 2,500 feet of new pipeline underneath the Delaware River using the process of horizontal directional drilling and tied this new stretch of pipeline into the existing Twin Oaks Pipeline at a location on Oakdale Avenue near the Mt. Eyre Manor neighborhood.

**C.      The Geographic Area Affected by the Twin Oaks Pipeline Leak**

60.     The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

61.     The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road, Beechwood Drive, and Bruce Road.

62.     Figure 3 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 3 shows the Pipeline.



Fig. 3: location of the Pipeline within Upper Makefield Township, retrieved from the National Pipeline Mapping System Public Viewer. *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

63.     There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood.

64.     Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

65.     An underground aquifer, which Defendants have now polluted, supplies the water used by residents of the neighborhood, including Plaintiffs.

66.     The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Mt. Eyre Road, Valley View Drive, Old Barn Court, Taylorsville Road, River Road, Oakdale Avenue, Maple Shade Avenue, West Street, Cross Street, Swayze Avenue, Pondview Drive, Heron Court, Belamour Drive, Aqueduct Road, and additional

surrounding roads, which run through other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

67.    Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

68.    The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D.    Known and Reported Odor Complaints Started in September 2023**

*i.    September 2023 Odor Complaint*

69.    On September 20, 2023, Defendants were notified directly by the owner-residents of 128 Walker Road of an overwhelming smell and taste of gasoline in their water. Defendants were also notified of this complaint separately on September 25, 2023, when PHMSA notified Defendants of an odor complaint referred by the Pennsylvania Department of Environmental Protection ("PADEP").

70.    The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered (121 Glenwood Drive), though Defendants did not confirm discovery of the Leak until 16 months later.

71.    Plaintiffs live at 114 Spencer Road, around only 500 feet to the approximate northeast of 128 Walker Road. The location is downgradient of the Leak's release point.

72.    In the two months prior to the odor complaint, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding

that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

73.     The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

74.     Each of these severe weather events should have triggered full proper inspections of the Twin Oaks Pipeline by Defendants pursuant to 49 C.F.R. § 195.414. Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

75.     Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation that was conducted was improperly performed in a lackadaisical fashion.

76.     Specifically, Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single 25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

77.     Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered.

78.     When the initial investigation did not result in evidence of a leak, Defendants simply and improperly ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

79.     Defendants then contacted the owners of 128 Walker Road and falsely told them they were "happy to report" that there was no oil or gas contamination in their water.

80.     When the owners of 128 Walker Road stated to Defendants' representative that this finding was impossible, Defendants' representative claimed that "it was probably some bacteria."

81.     As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

### ii.     *June 2024 Odor Complaint*

82.     On June 28, 2024, Defendants received yet another odor complaint from a different resident, this time at 108 Spencer Road in the Mt. Eyre Manor neighborhood, who called Defendants' so-called "emergency" phone number to alert Defendants about the smell.

83.     108 Spencer Road is just two properties to the east from Plaintiffs' home. Indeed, Plaintiffs' property at 114 Spencer Road is located *in between* 108 Spencer Road and the location where the Leak was ultimately detected at 121 Glenwood Drive.

84.     In response to the odor complaint, Defendants responded in an even more careless manner than it did to the first complaint when, in fact, the response should have been more robust since a prior complaint had already been received. Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the Pipeline.

85.     Based on the technician's report and limited inspection, and nothing else, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

86.     Inexplicably, Defendants also failed to report this odor complaint to PHMSA.

87.     Defendants also sent an individual to speak with the residents at 108 Spencer Road at their home in response to this odor complaint. This representative of Defendants stated that there was no leak, and that Defendants would know right away if there ever was such a leak, because Defendants would notice either a pressure drop or a loss of product in the Pipeline.

88.     Unsatisfied with this limited response (which of course turned out to be incorrect), the residents of 108 Spencer Road also contacted Sue Erickson, a right-of-way specialist and public-facing representative for Defendants. Erickson assured Plaintiffs that there was no issue with the Pipeline, that it had been "probed," and that there was no loss of pressure indicating any leak. This response ultimately demonstrates the unreliability and defective nature of Defendants' methods for monitoring and detecting leaks.

### iii.     July 2024 Odor Complaint

89.     The following month, on or about July 21, 2024, Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road and made the first complaint detailed above, *and* the precise address where Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

90.     The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

91.     Again, Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

92.     In response to this July 2024 odor complaint, Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment

did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

93.     Based on the technician's report, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor and again failed to implement or conduct any proper continued monitoring or observation of the area.

94.     Moreover, yet again, Defendants failed to report this odor complaint to PHMSA.

95.     Furthermore, Defendants told the residents at 121 Glenwood Drive at the time that there was no petroleum in their water, without conducting proper tests to ascertain this as a fact.

96.     Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

### iv.     *November 2024 Odor Complaint*

97.     Four months later, on November 21, 2024, Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road and only a few houses away from Plaintiffs' home.

98.     The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

99.     The residents at 107 Spencer Road asked their well company, Bucks County Well Drilling Co. ("BCWD"), to investigate. BCWD and the residents of 107 Spencer Road could clearly observe a sheen in the water.

100.    Disturbed by this discovery, the residents at 107 Spencer Road had samples taken and them to an independent laboratory. The samples came back ***positive*** on October 24, 2024, for diesel range organics (C10-C28) at 3,920 milligrams per liter and gasoline range organics at 573 milligrams per liter.

101.    The residents at 107 Spencer Road notified Defendants of this result. Once again, and despite these now positive test results, Defendants' response was more than insufficient and neglectful.

102.    Soon after receiving this alarming test result, in November 2024, an individual purporting to be an agent of Defendants appeared at 107 Spencer Road in the dark at night. He denied that Defendants were responsible for the petroleum product present in the water at 107 Spencer Road but agreed to continue monitoring the situation.

103.    Despite this now being the fourth known odor complaint received from a resident in the direct vicinity of where the Pipeline Leak was eventually discovered, Defendants again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

104.    Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to Defendants that the results were within acceptable limits, although the operator did not report the acceptance criteria used or the results of the pressure test.

105.    Based on the reports of the technician and operator, Defendants ceased their investigative efforts, notwithstanding that there had now been at least four complaints reported

since September 2023. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

106.    In what was now clearly a systemic pattern, Defendants again did not report this odor complaint to PHMSA.

107.    Unlike Defendants, the owners at 107 Spencer Road continued to investigate their disturbing test results. They alerted their homeowners' insurance company, who retained environmental firm Phoenix Consulting, LLC.

108.    Phoenix began interfacing directly with PADEP, which stated that it had received multiple complaints from concerned residents over the last year but that the water at 107 Spencer Road was the first instance of failing laboratory results.

109.    Phoenix collected samples directly from the well at 107 Spencer Road on December 17, 2024. These samples contained a very clearly observable yellow petroleum product in the groundwater:





110.    Phoenix had the water from these jars tested and communicated the results of those tests to the PADEP, whose representative Richard Staron indicated that a jet fuel release from the Twin Oaks Pipeline was a likely source.

111.    These results indicated the presence of benzene, toluene, ethylbenzene, isopropylbenzene, chloroform, naphthalene, xylenes, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, and lead.

112.    Defendants finally performed testing of the well at 107 Spencer Road themselves on January 24, 2025, through a contractor, Groundwater & Environmental Services, Inc. ("GES"), as described in more detail below.

113.    Discovery and expert testimony will show that Defendants' responses to all the odor complaints detailed above were far below the standard of care and duties that Defendants owed to the residents of Mt. Eyre Manor and the surrounding neighborhoods, both with respect to the urgency of the situation, the actions that were taken, and the lack of any substantive follow-up,

monitoring, and testing to determine that the Pipeline was leaking and contaminating the community including the aquifer used by Plaintiffs and other members of the proposed Class.

114.    Because of Defendants' lack of a proper response, Defendants never timely identified a cause of the taste and odor complaints, until the Twin Oaks Pipeline Leak was discovered only much later in January 2025.

E.    **The Twin Oaks Pipeline Leak is Discovered in January 2025**

115.    On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. PHMSA notified Defendants of the test results and directed Defendants to investigate the origin of the kerosene.

116.    On or about January 22, 2025, a representative of Defendants, Wassim Saad, parked in Plaintiffs Daniel and Katherine La Hart's driveway in an unmarked truck with a New Jersey license plate and knocked on their door to offer "free well testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to Plaintiffs at this time as a representative of Defendants or tell Plaintiffs about the presence of kerosene at 107 Spencer Road, even though that property's well is mere feet from Plaintiffs' property line. Indeed Mr. Saad's, business card indicated that he worked for a company called "Wood PLC."

117.    Plaintiffs declined the offer for "free well testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

118.    Shortly thereafter, Plaintiffs noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and Plaintiffs then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown.

119.    Plaintiffs then contacted Mr. Saad and Defendants took a purported test of Plaintiffs' water on January 24, 2025, but only by collecting water only from Plaintiffs' faucet and not their well.

120.    At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving Defendants, and Plaintiffs encouraged other residents to get their water tested.

121.    From January 22, 2025, through January 31, 2025, Defendants had a contractor, Groundwater & Environmental Services, Inc. ("GES"), acting on behalf of and as an agent of Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

122.    GES confirmed the presence of hydrocarbons in well water at certain properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive, each of which surround Plaintiffs' property.

123.    From January 22, 2025, through January 31, 2025, Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with Defendants' prior investigations, the gas detector results were reported as "non-detect."

124.    Despite the repeated failures of Defendants' PID gas detector to identify a leak, eventually on January 31, 2025, Defendants visually observed and finally confirmed a substantial leak in the Twin Oaks Pipeline when they excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the residents who live there, next to the swimming pool where the residents' family swam prior to the discovery of the Leak.

125.    The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

126.    Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is not currently known why Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

127.    Video of the Pipeline Leak was recorded by one of the residents at 121 Glenwood Drive.

128.    The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

129.    Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

130.    The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

131.    The pipeline industry views Type A sleeves as ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature

26

of petroleum products moving at high pressure inside a pipeline means that dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

132.    For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve, and its detection systems failed to detect the crack or the release of any product.

133.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the Leak by local residents, were able to identify and repair the crack. That pipeline's operator initially reported the release as involving 63,000 gallons (3 percent of the actual volume lost).

134.    In light of this and other similar incidents and their own knowledge and experience as to pipelines and the advantages and drawbacks of certain standard operating procedures and repair equipment, Defendants here knew or should have known that the approximately thirty year-old Type A sleeve situated on the residential property at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, a community where residents rely on well water for their water needs, was insufficient reinforcement to prevent a discharge from occurring from the Pipeline and especially under or near a residential property and neighborhood.

135.    On January 31, 2025, Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and without good basis reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

136.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, Defendants have maintained in statements made to residents and regulatory authorities after January 31, 2025, that in fact, Defendants do not know how much product has been released into the environment.

137.    Still, Defendants have also repeated the 6,552 gallons figure at other times to regulatory authorities, including to the PADEP on April 18, 2025.

138.    It is highly likely because of the amount of time that the Leak was occurring, the size of the Leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

139.    Due to Defendants insufficient, improper, negligent, and reckless conduct alleged herein with respect to their oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline, Defendants have no idea when the Pipeline began leaking.

140.    The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when Defendants discovered the Leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline was operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

141.    PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."[6]

---

[6] Exhibit C, Notice of Proposed Safety Order, Pipeline and Hazardous Materials Safety Administration, CPF No. 4-2025-054-NOPSO (Feb. 13, 2025).

142.    Defendants have represented repeatedly, in statements to both residents and regulatory authorities, that despite their investigation since discovering the Leak, they still do not know when the Pipeline Leak truly began.

143.    It is probable that the Twin Oaks Pipeline was leaking for a significant period of time, even prior to the first known odor complaint being made to Defendants in September 2023.

144.    Defendants have stated repeatedly in statements to both residents and regulatory authorities that they do not know whether the Twin Oaks Pipeline is still leaking.

145.    Defendants have not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline.

**F.    Defendants' Response and Actions Following Discovery of the Pipeline Leak**

146.    On January 31, 2025, Defendants cut off the segment of the Pipeline where the Leak had been discovered and submitted a repair plan to PHMSA. Defendants had their workers arrive and remove the leaking segment in the middle of the night, without giving notice to residents or to local, state, or federal regulators.

147.    Plaintiffs and the Class members demand immediate access to review and examine the leaking segment of the Twin Oaks Pipeline and expect Defendants to preserve all aspects of the Pipeline which they removed.

148.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming they had discovered "product loss" and claiming that the Pipeline was "inactive" at the time the Leak was discovered.

149.    This statement means, among other things, that the video of the Pipeline that shows that Pipeline Leak is not indicative of the actual full Pipeline Leak under usual operating pressure conditions.

150.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline were currently leaking, shockingly rushed to return the Pipeline to service.

151.    Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

152.    Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the actual tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was present, Defendants' exposure testing relied on samples taken from faucets inside the residences post-treatment, and inadequate PID readings.

153.    In at least one instance, when Defendants' retained testing agents, hired by and working on behalf of Defendants, discovered that they had taken a sample directly from a well for testing by mistake, ***they threw out the sample and erased the results***.

154.    Defendants' method of exposure testing thus deviated from the standard protocols for testing groundwater, which universally require testing pre-treatment, and was seemingly designed to limit Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

155.    Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though Defendants recently have, at the behest of Plaintiffs and

other residents who have retained the undersigned counsel, finally begun to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

156.    Indeed, even in situations where Defendants' agents have *visually observed* the presence of LNAPL, they have not universally retained the water from the bailer for testing and have instead in instances deposited this contaminated water back into the well.

157.    Defendants, moreover, despite being well-aware that their conduct as alleged herein would give rise to residents' legal claims, have failed to properly preserve all evidence of environmental contamination that they have found during their activities, including by, for example, failing to properly catalog and store all physical materials and things that they have inserted into or withdrawn from residents' wells.

158.    Defendants have not ensured that they and their agents have properly preserved all evidence gathered as a result of Defendants' and GES's activities in the neighborhood following the discovery of the Pipeline Leak. Therefore, Plaintiffs and Class members are entitled to all reasonable adverse inferences that may arise as the result of any failure to properly preserve evidence.

159.    On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with Defendants' other representatives Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

160.    On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the

surrounding neighborhoods, including Plaintiffs. Representatives from PHMSA and the Defendants also were present.

161.    At this townhall meeting, Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells to that time.

162.    Defendants admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

163.    Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Defendants' best estimation at the time concerning the plume caused by the Pipeline Leak of unknown quantities of jet fuel and other petroleum products.

164.    At the town hall meeting, Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

165.    During this townhall meeting, officials from PHMSA stated that they had no confidence in Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including Plaintiffs, called on Defendants to shut down the Pipeline.

166.    Defendants refused (and still refuse) to shut down the Pipeline.

167.    On February 7, 2025, the day after the town hall meeting, Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather

than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

168.    On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

169.    PHMSA thereafter issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey, and conducting a root cause failure analysis.

170.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including Plaintiffs, representatives from Defendants, and representatives from PHMSA and state regulators attended the meeting.

171.    During this meeting, residents, including Plaintiffs, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

172.    Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

173.    Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. Defendants, however, then admitted that they had not yet installed a single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

174.    Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were (at best) misleading. At the time Defendants made these statements, in fact, Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the actual direction or flow rate of the groundwater underlying the point or points of discharge.

175.    Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

176.    During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to Defendants

34

about her concerns of contamination resulting from the Twin Oaks Pipeline, and Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

177.    After the discovery of the Pipeline Leak, when Defendants finally sent a contractor to inspect her well, they discovered *over **twelve feet of jet fuel** on top of the water in her well*, and after pumping the water, *estimated that **fifteen feet of jet fuel** had been accumulating in the well since 2023*. The resident stated that according to Defendants' contractor, *over 22 inches of jet fuel had accumulated in her well **in the past week alone***. Indeed, significant product continues to accrue daily in this well.

178.    Residents asked Defendants for a guarantee during the February 13, 2025, town hall meeting that the Twin Oaks Pipeline was not still leaking. Defendants responded that they were not able to provide such a guaranty at that time.

179.    Defendants did make one guarantee at the February 13 town hall: they confirmed that they would provide medical monitoring to the Mt. Eyre Manor community and surrounding neighborhoods as a result of the Leak. Defendants' representative Matt Gordon, a vice president of operations and the individual who Defendants put forward as the authority figure speaking on Defendants' behalf at the town hall, confirmed Defendants' commitment to medical monitoring. This admission is recorded on video, but to Plaintiff's knowledge no such medical monitoring has been conducted.

180.    On February 18, 2025, PADEP sent Defendants a Notice of Violation.[7] In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood,

---

[7] Exhibit D, Notice of Violation, Pa. Dep't Envt'l Protection (Feb. 18, 2025).

with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

181.    On February 19, 2025, counsel for Defendants responded to the NOPSO issued by PHMSA.[8] Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." Defendants stated that it did not have evidence of an ongoing leak, but also that its investigation was ongoing. Defendants did *not* state that it had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

182.    On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Defendants were present at the meeting.

183.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: "**This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it.**" He further stated that Energy Transfer's "**focus and goal is to restore the community to its original state**."

184.    Defendants' representatives also stated during the February 27 town hall meeting that they provided their initial estimate of 156 barrels of product lost based on their understanding that federal law required a reporting of the amount of product lost within 48 hours of discovery of

---

[8] Exhibit E, Letter from Haley O'Neill to Bryan Lethcoe (Feb. 19, 2025).

a leak. Defendants *admitted* that at the time they made the representation to PHMSA, they had no factual basis upon which to assert the amount of product lost, and that they continue to lack an evidence-based estimate of the amount of product that has been discharged into the underlying bedrock and aquifer beneath the Mt. Eyre Manor neighborhood, in Upper Makefield Township.

185.    This signifies and demonstrates that Defendants do not maintain proper and adequate leak detection and monitoring systems with respect to the Twin Oaks Pipeline.

186.    On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline Leak.[9] In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

187.    Governor Shapiro further described the Leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

188.    On March 4, 2025, Defendants also sent to the PADEP a revised Notice of Intent to Remediate indicating that they intended only to remediate "Jet Fuel and unleaded gasoline parameters (benzene, toluene, ethylbenzene, total xylenes, methyl tertbutyl ether, isopropylbenzene, naphthalene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloroethane, 1,2-dibromoethane, and lead) for Residential Statewide Health Standards in soil and groundwater." By selecting the Statewide Health Standards as their chosen cleanup standard, Defendants have confirmed that their plan is to leave their contamination in place to continue polluting Plaintiffs' and the neighborhood's water, soil, and air.

---

[9] Exhibit F, Letter from Governor Josh Shapiro to Secretary Sean Duffy (Feb. 28, 2025).

189.    On March 5, 2025, Defendants responded to the Notice of Violation previously issued by the PADEP. Despite having been told by the PADEP to describe "the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area," Defendants' response was devoid of any of this information. *See* Exhibit G.

190.    Instead, Defendants simply recited the same limited history of inadequate responses to resident complaints that are described herein, starting in September 2023. The response did not in any meaningful way describe "the circumstances causing the incident" and has no information regarding "historical investigation of the pipeline in this area." *Id.*

191.    On March 6, 2025 (the next day), PADEP issued an Administrative Order to Defendants Energy Transfer (R&M), LLC and Sunoco Pipeline, L.P., directing Defendants to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

192.    PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

193.    On March 19, 2025, Defendants submitted an Interim Remedial Action Plan ("IRAP") to the PADEP. The IRAP contained numerous exhibits with test results and other

characterizations of the state of the neighborhood in the weeks following the Leak, including but not limited to the following:

    a.   Soil testing at 121 Glenwood Drive, the property where the Leak was detected, confirmed the presence of many dangerous constituents of jet fuel and other harmful contaminants, including toluene, ethylbenzene, isopropylbenzene, xylenes, phenanthrene, naphthalene, arsenic, barium, beryllium, and lead; the results were also positive for significant quantities of total hydrocarbons in the diesel range (C10-C28). *See* IRAP Attachment 4.

    b.   A summary table indicated that: at least 6 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, and an additional 19 residences had tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs.[10]

194.   The IRAP also included an attachment indicating the inferred general trend of bedrock features based on Defendants' analysis to date:

---

[10] In environmental testing, a "J-value" indicates that a result is an estimated value.



IRAP, Attachment 14.

195.    As this figure demonstrates, Plaintiffs and their neighbors are directly within the zone of danger to experience ongoing and future contamination because of the Leak. Indeed, as indicated by the red lines, one of the bedrock features runs directly from 121 Glenwood Drive (the Leak location) through 114 Spencer Road, which is Plaintiffs' property.

196.    This bedrock trend figure also publicly revealed for the first time that LNAPL had been detected at 110 Spencer Road, directly next door to Plaintiffs' property.

197.    On April 18, 2025, Defendants submitted a Site Characterization Work Plan ("SCWP") to the PADEP.  *See* Exhibit H.

198.    The SCWP confirmed that the Pipeline transports not just jet fuel but also "occasionally transports unleaded gasoline and diesel fuel." *Id.* at 2.

199.    In the SCWP, Defendants again falsely "estimate[d]" that the extent of the Leak's volume was 156 barrels but did not classify what petroleum product this constituted. *Id.*

200.    Defendants revealed that in addition to jet fuel LNAPL being observed at several homes in the community, additional LNAPL that "appears to be a different petroleum product" was observed at "an additional property on Spencer Road," where Plaintiffs reside.

201.    While Defendants referenced figures and maps that purportedly revealed the locations of LNAPL observations and other important data, Defendants inexplicably redacted most of the relevant information from the SCWP, and its exhibits.

202.    On May 2, 2025, PHMSA executed a Consent Order and Consent Agreement with Defendant SPLP, directing SPLP to take specific corrective actions following PHMSA's investigation into to the Leak. These corrective actions include: (i) verification of the integrity of every Type A sleeve installed on the Twin Oaks Pipeline; (ii) submission to PHMSA within 90 days of a comprehensive plan for identifying, evaluating, and removing any Type-A sleeves whose integrity cannot be assured, as well as a technical justification for any Type-A sleeves that remain on the line and a plan to implement additional integrity management measures to minimize any risks associated with their continued use; (iii) a requirement that the Pipeline continue to operate at a 20 percent reduction in pressure; (iv) submission within 45 days of mechanical and metallurgical testing results; submission within 120 days of a failure history evaluation and a root cause failure analysis; and (v) evaluation and improvement of the effectiveness and capabilities of Defendants' leak detection system to ensure that any future leaks of this nature are identified immediately.

203.    On May 9, 2025, Defendants updated their summary table of results of the water testing performed in Mt. Eyre Manor and the surrounding neighborhoods. *See* Exhibit I. This updated table indicated at least 7 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, up from 6 in

the March 19th version of the table. *Id.* An additional **36 residences** also tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs, almost double the 19 residences in these categories in the March 19th version. *Id.* Clearly the magnitude and scope of contamination is only getting worse, and not better.

204.    On May 13, 2025, the PADEP responded to Defendants' SCWP and found that the submission was "deficient." PADEP requested more information on the LNAPL believed to be a different petroleum product and otherwise requested more complete information from Defendants. PADEP also faulted Defendants for their excessive and improper redaction of the figures and attachments to the SCWP. *See* Exhibit J.

205.    As the results from the March 19 and May 9 tables indicate, the harm caused by Defendants' actions as alleged herein and the Pipeline Leak is not limited to the contamination of certain limited residences above MCLs under Pennsylvania state regulations.

206.    Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel. Further, the 500-foot buffer required by the PADEP is insufficient to safeguard Class members from injuries that Defendants have caused as a result of the Pipeline Leak, as contamination has already been detected beyond this 500-foot buffer.

207.    Judicial intervention is necessary to impose appropriate and reasonable full protective measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP.

208.    Testing has indicated that at least **43 residences**, including Plaintiffs', have already been affected and demonstrably contaminated by the Leak. Defendants' investigation is ongoing, and the number of wells that Defendants know to be impacted continues to increase.

209.    Despite this knowledge, to date Defendants have not admitted publicly to the full scope of contamination in the Mt. Eyre Manor neighborhood, and instead continue to attempt to only minimize it.

210.    In multiple incidences, residents have requested that GES technicians taking post-treatment samples from their faucets also take pre-treatment samples from their wells for testing. GES technicians repeatedly have responded that they had instructions from Defendants not to conduct any testing of well water pre-treatment, and to only take samples from faucets in the residents' homes.

**G.    Environmental Contamination Resulting from the Pipeline Leak**

211.    The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown.

212.    Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' wells and, as Defendants recently revealed, a petroleum product other than jet fuel was found in at least one well on Spencer Road.

213.    Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023. Moreover, product is continuing to accumulate in this well despite Defendants' efforts to remove it. Every day since the contamination was initially discovered by Defendants' contractors, more of Defendants' hazardous product has seeped into the well.

214.    Free-standing petroleum or jet fuel product was found accumulated on top of the water in several other wells near the site of the Leak, including nearly six feet of product in the

well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road. Product has been observed on top of the water in the wells of at least fifteen other nearby residences to date.

215.    In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

216.    For example, the residents at 105 Spencer Road have been smelling gasoline on their property since June of 2024, and at times have been able to taste gasoline in their water.

217.    The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water at various points in the water he uses to drink, cook, and shower.

218.    Residents in the affected community feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors' properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[11]

219.    Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of many residences in the neighborhood.

220.    Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene,

---

[11] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

221. There is no potential source of these substances in the surrounding area other than the Twin Oaks Pipeline.

222. Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

223. Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

224. TMB isomers are produced during the petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

225. MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the

source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns, and as such it is not clear why wells are testing positive after the Pipeline Leak.

226.    Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure, and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

227.    Symptoms resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

### H.    Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality

228.    Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. Defendants' messaging, however, has not matched reality.

229. For example, Defendants have now suggested that the Pipeline Leak may have happened right before it was discovered in January 2025, despite residents smelling and reporting the odor of gasoline since at least September 2023, 16 months earlier.

230. Defendants have also now suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

231. Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants have no known way to accurately measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood or means to determine when the Leak started.

232. Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time indicating it was likely much stronger when the Pipeline was operated with full pressure.

233. Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they were purchasing their homes that Defendants had instituted state-of-the-art, leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and Defendants' actions and follow up (or

lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

234.    In fact, Defendants failed to have proper leak detection and monitoring systems in place with respect to the Twin Oaks Pipeline.

235.    Defendants claimed that their leak detection systems for the Pipeline were functional, but in reality, and despite residents pointing out an issue for 16 months, making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak. Defendants only detected and located the Pipeline Leak when they went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred. Defendants would not have identified the Pipeline Leak except by digging up the Pipeline, which facts do not suggest or support that Defendants had an adequate leak detection and monitoring system in place.

236.    Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline, and many more are believed to have not been physically inspected by way of excavation.

237.    Crucially, Defendants also claimed to have made a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. Defendants, however, have invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to basic information and facts about the Pipeline Leak and the proposed remediation plans. Defendants' failure to engage has only increased since the residents have hired legal counsel to protect their interests and all public meetings are now only through "tele-townhalls" during which Defendants tightly control the questions presented.

238.    Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the town hall meeting that took place on March 11, 2025. At this meeting, Defendants shut down any attempt to receive questions from the public, claiming that Defendants could no longer continue to provide information because some residents had retained legal counsel. Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel, and further reflects Defendants' insensitivity to the crisis unfolding in the affected community, and the failure to take responsibility.

239.    The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

240.    Moreover, Defendants have continued to transport highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline – which when installed was not designed for those pressures – in spite of their knowledge that (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) that there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) that did not have a proper monitoring and leak detection system.

241.    *For over 16 months*, despite their knowledge that the Pipeline faced a danger of corrosion and cracking, Defendants failed to properly respond to nearby odor complaints in a manner reasonably likely to detect a leak and had no sophisticated leak detection equipment in place to do so, notwithstanding that Defendants were operating the Twin Oaks Pipeline in a residential neighborhood.

242.    In response to multiple odor complaints, Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of portable gas monitors to detect fuels in the surrounding air.

243.    Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

244.    Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast resources, failed to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances.

245.    Defendants have directed their contractors, generally, to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

246.    Despite failing to determine whether any ongoing leaks persist in the Pipeline, Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

**I.    Harm to Plaintiffs and Class Members**

247.    Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

50

248.    The entire impacted community relies on well water drawn from the underlying aquifer for their water needs. This aquifer is now contaminated. As such, the entire community, including Plaintiffs, has suffered tangible, physical injury as a result of the Pipeline Leak.

249.    Confirming that the aquifer is contaminated, numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells.

250.    Preliminary testing has shown that water samples collected from nearby homes have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

251.    The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of all out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

252.    Examples of these out-of-pocket costs include, without limitation:

   a.    the costs to engage and pay contractors, testing companies, and inspectors;

   b.    the costs of installation of remedial or additional water treatment systems;

   c.    the costs of purchasing and maintaining filters associated with water treatment systems;

   d.    the costs of damage and remediation to private wells;

   e.    the costs of remediation of soil;

   f.    the costs of remediating other damages caused by the Pipeline Leak;

   g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

h.     the costs of temporary housing;

i.     the costs of commuting to other locations for the purpose of showering or doing laundry;

j.     reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

k.     the cost of any increased insurance premiums;

l.     the cost of lost time-value from having to take off work due to the Pipeline Leak;

m.     the cost of childcare while attending meetings related to the Pipeline Leak; and

n.     the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

253.    Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by their Pipeline Leak, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

254.    Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

255.    Some Class members have already had potential buyers walk away from a potential sale because of the Pipeline Leak and, as a result, have had to substantially lower the list prices of homes currently on the market. Not a single public home sale has closed in Mt. Eyre Manor since the Leak was revealed and the only home sale that has taken place is the purchase of 108 Spencer Road by Defendants.

256.    Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak. Plaintiffs and Class members cannot enjoy their property in the same manner as prior to the Pipeline Leak.

257.    As a direct and proximate result of Defendants' negligent, reckless, and willful conduct in causing and/or failing to prevent the Leak of jet fuel into the ground and groundwater supply, Plaintiffs and the proposed Class members have suffered and continue to suffer severe emotional distress. Plaintiffs reside in a community that is entirely dependent on well water drawn from a shared aquifer, which is now contaminated by toxic substances including hydrocarbons, volatile organic compounds, and known carcinogens present in jet fuel.

258.    Since the revelation of the Leak and subsequent confirmation of groundwater contamination, Plaintiffs and the proposed Class members have experienced profound anxiety, fear, and uncertainty regarding the safety of their homes, their health, and the wellbeing of their families. Some residents have reported symptoms potentially linked to exposure to contaminated water, further exacerbating psychological distress. Plaintiffs live with the daily trauma of having to use bottled water for drinking, cooking, and hygiene, and the persistent fear that they or their loved ones may suffer long-term health consequences due to ingestion or exposure to toxic chemicals.

259.    In addition to the tangible disruption of daily life, Plaintiffs experience ongoing emotional harm from the loss of security, trust, and peace of mind in their environment. The knowledge that their community has been poisoned — and that this contamination may persist for years or decades — has caused deep emotional anguish. Plaintiffs and members of the proposed Class report symptoms of depression, sleeplessness, and post-traumatic stress, as they previously viewed their homes as safe havens now rendered unsafe by Defendants' conduct.

260.    Plaintiffs live less than 500 feet from the location where the Leak was detected and are in between that location and the confirmed highly contaminated homes on Spencer Road. Indeed, Plaintiffs themselves live on contaminated property that sits above a contaminated aquifer. As such, Plaintiffs are at immediate risk of physical injury and are clearly within the zone of danger presented by the Pipeline Leak.

261.    Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**J.    Harm Suffered by Plaintiffs Daniel and Katherine La Hart**

262.    Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

263.    As such, Plaintiffs are Pennsylvania residents.

264.    Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

265. Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

266. Prior to learning of the Pipeline Leak, Plaintiffs were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

267. Plaintiffs and their young children used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

268. In late 2024, Plaintiffs invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

269. The Pipeline Leak has caused Plaintiffs to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

270. The Pipeline Leak and resulting contamination has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting

environmental contamination has tangibly decreased the value of Plaintiffs' property and that of the surrounding affected community.

271.    It is likely that Plaintiffs (and Class members) are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

272.    The Pipeline Leak has caused 114 Spencer Road to go from being Plaintiffs' idyllic forever home to an albatross that Plaintiffs will struggle to sell for close to its fair market value, which was over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home in the tens of thousands or hundreds of thousands of dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

273.    But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of selling what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

274.    Moving would cause significant hardship to Plaintiffs and their young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home in a comparable community.

275.    With respect to Plaintiffs' private well, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

276.    Plaintiffs' well water has already tested positive for MTBE and lead above background concentration levels and Plaintiffs are awaiting additional testing results.

277.    Like each of the other residents throughout Mt. Eyre Manor, Plaintiffs now also live above a contaminated aquifer that continues to migrate and further contaminate the groundwater, soil, and air. This contaminated aquifer constitutes a presently existing physical harm to Plaintiffs' real property.

278.    Defendants' own inferences about the composition of the fractured bedrock beneath Plaintiffs' property indicate that a pathway for groundwater flow exists that runs from 121 Glenwood Drive, the site of the Leak, directly through Plaintiffs' property.

279.    Plaintiffs are directly within the zone of danger presented by the Leak given that their property at 114 Spencer is located directly in between properties with confirmed free petroleum product or LNAPL found in wells (such as 110 and 108 Spencer). Indeed, it is difficult to reach any inference other than that Defendants' petroleum product contaminated and traveled through or below Plaintiffs' land to reach these other contaminated properties.

280.    Additionally, Plaintiffs and their neighbors on Spencer Road live directly above the trench for the former 8-inch version of the Pipeline. To the extent the existence of this alternate trench has contributed to the direction the plume has traveled, Defendants' petroleum product traveled directly through Plaintiffs' land.

281.    It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at 114 Spencer Road.

282.    Worsening the situation, Defendants have begun buying residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road which is only two houses away from Plaintiffs' home, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak. These activities by Defendants are a nuisance to Plaintiffs and Class members in the neighborhood and are interfering with their use and enjoyment of their property, as well as further depreciating the affected geographic area.

283.    Defendants' activities at 108 Spencer Road became an epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak:



284.    Defendants are currently attempting to purchase additional homes in the Mt. Eyre Manor neighborhood to conduct monitoring and recovery activities with respect to the Pipeline Leak, which (while perhaps necessary) will further cause nuisance and further diminish the value of the neighborhood.

285.    Plaintiffs are fearful that Defendants will continue to buy additional nearby homes and that any home bought by Defendants will eventually lay vacant and be a nuisance to the community, further driving down property values.

286.    Confirming that Plaintiffs and the proposed Class have suffered concrete, particularized, and significant loss of property value, Defendants have recently taken affirmative steps to obscure the market impact of the diminution of value Defendants have caused. With respect to at least one property in Mt. Eyre Manor that is currently for sale, Defendants have acquired a "right of first option and right of rejection" over the property, defined as follows:

> This property is subject to a right of first option and right of rejection held by Sunoco Pipeline L.P. ("SPLP"). Under this agreement, if the Seller receives a bona fide offer to purchase the property, the Seller must notify SPLP of the terms of the offer. If the offer is below a certain price SPLP shall then have the right to (i) direct the Seller to reject the offer; or (ii) make an offer to purchase the Property for an amount greater than the amount contained in the offer. If the offer is above a certain price, SPLP shall only have the right to make an offer to purchase the Property for an amount greater than the amount contained in the offer. SPLP has two (2) business days from receipt of the offer or any counter-offer to exercise its rights. SPLP's rights under this agreement are valid until January 19, 2026. Note that nothing in the agreement prevents a counter-offer(s) from the original offeror.

While the full contours of the agreement are unclear because they reference an unspecified "certain price" against which offers are compared, Defendants' right to *unilaterally* "direct the Seller to reject" any offer below that price—a right Defendants undoubtedly paid the subject homeowner for—could be used by Defendants in an attempt to mask the true current market value of the property. That Defendants were willing to pay to acquire this right confirms that significant, quantifiable diminution of value has taken place throughout Mt. Eyre Manor and the surrounding neighborhoods.

287.    Additionally, Defendants have installed recovery wells in the street on Glenwood Drive, which is one of the roads Plaintiffs use to access their home. The installation and use of

these wells, which are less than 500 feet from Plaintiffs' property, have created yet another epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, as Defendants use heavy machinery, like sonic and air rotary drill rigs, producing sound levels up to 99 decibels:



288.    While installation of some recovery wells is likely necessary given the magnitude of the Leak, Defendants have inexplicably chosen to drill such wells to a depth of only 70 feet, even though the contamination to date suggests that petroleum product exists deeper underground.

289.    Moreover, Defendants have failed to delineate the scope and direction of the plume. While Defendants have now placed these recovery wells in the neighborhood, including in the middle of Glenwood Drive, they have begun these efforts despite not having installed proper monitoring wells. Indeed, while Defendants have stated that they intend to ultimately install eight

monitoring wells, they did not reveal their proposed location until yesterday, June 3, 2024, and seemingly plan to inappropriately limit their depths to just 70 feet, despite possible pathways for contaminants to migrate along much deeper fractures. The proposed locations of the monitoring wells confirm that even Defendants understand there is contamination and a grave risk of ongoing contamination both at Plaintiffs' property (114 Spencer Road, next to one of the two proposed well locations on Spencer Road) and throughout the community:



290.    Defendants have also relied heavily on electrical resistivity imaging ("ERI") to determine where the contamination may be by identifying inferred fractures. However, the validity of the inferred fractures is highly questionable. Interpretation of fractures within bedrock from ERI models are commonly based on low resistivity features in the bedrock (because fractures within bedrock typically contain more water than surrounding rock and, therefore, conduct electricity relatively better). Interpreting low resistivity zones in bedrock as fractures may be appropriate if

data quality is good and there is no infrastructure (such as buried metallic pipes) distorting the data. However, as is common in urban or suburban settings, the ERI models collected in the Mt. Eyre Manor neighborhood show numerous "low resistivity anomalies" that are consistent with the anomalies produced by buried metallic pipes or electrically grounded equipment/powerlines. Based on the limited public data available, a number of these anomalies have wrongly been interpreted as inferred fractures based on utility interference.

291. For the reasons alleged herein, Defendants' Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities. While Defendants have publicly accepted responsibility for the Pipeline Leak, they have not accepted their corresponding responsibilities to compensate Plaintiffs and Class members for all the harms that they have suffered as a direct result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

292. Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

293. Plaintiffs bring this action on behalf of themselves and on behalf of the following Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> All Pennsylvania citizens who owned, rented, and/or resided in real properties in Pennsylvania within a one mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania (40.271265, -74.876153), as represented in Figure 3 below, during the time period from September 1, 2023 to the present (the "Class").



Figure 3.

294.     Excluded from the Class are Defendants and their subsidiaries or affiliated entities, as well as any individuals who resided at the following addresses in Upper Makefield Township since September 1, 2023: 121 Glenwood Drive; 128 Glenwood Drive; 128 Walker Road; 105 Spencer Road; 107 Spencer Road; and 108 Spencer Road.

295.     Plaintiffs reserve the right to further define and modify the definition of the Class following further factual investigation and discovery.

296.     **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

297.     **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the

claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

298.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

299.    **Adequacy of Representation.** Plaintiffs are members of the Class. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

300.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.      Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.      Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.      The appropriate measure of restitution and/or measure of damages to the Class members.

301.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

302.    **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## <u>CAUSES OF ACTION</u>

303.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

## COUNT I
## NEGLIGENCE
### (Individually and on Behalf of the Class)

304.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

305.    Defendants' actions as alleged herein were negligent.

306.    Defendants are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

307.    Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

308.    Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

309.    Defendants failed to use reasonable care in identifying the scope of the Leak or of the resulting pollution plume once the Pipeline Leak had been identified.

310.    Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

311.    Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

312.    Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

313.    Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

314.    Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

315.    Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually. Plaintiffs' claims for emotional distress damages are brought individually on behalf of Plaintiffs.

316.    Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

317.    Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

318.    Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline, demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

319.    The actions of Defendants as set forth herein also constitute negligence per se.

320.    Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Act).

321.    The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

322.    Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

323.    The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 601012(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id.*

324.    Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444; (b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

325.    The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

326.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

## COUNT II
## STRICT LIABILITY – ABNORMALLY DANGEROUS
## OR ULTRAHAZARDOUS ACTIVITY
### (Individually and on Behalf of the Class)

327.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

328.    Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

329.    Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

330.    Defendants' transportation of petroleum products was solely for Defendants' business purposes.

331.    Defendants knew and understood that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage, environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

332.    Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

333.    As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

334.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

69

## COUNT III
### PUBLIC NUISANCE
**(Individually and on Behalf of the Class)**

335.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

336.    Defendants' conduct constitutes a public nuisance pursuant to 35 P.S. 691.401.

337.    Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiff and the Class as alleged herein.

338.    Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT IV
### PRIVATE NUISANCE
**(Individually and on Behalf of the Class)**

339.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

340.    Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

341.    Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

342.    The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

343.    Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

344.    Plaintiffs are entitled to damages as a result thereof.

## COUNT V
## TRESPASS
### (Individually and on Behalf of the Class)

345.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

346.    Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

347.    Defendants knew or should have known that their failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks would result in the intrusion of their product on Plaintiffs' property.

348.    Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

349.    Plaintiffs are entitled to damages as a result thereof.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Individually)

350.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

351.    Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

352.    Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

353.    Defendants breached their duty to Plaintiffs by both their actions and inactions.

354.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

355.    As a result, Plaintiffs have been damaged as alleged herein.

## COUNT VII
## MEDICAL MONITORING
### (Individually and on behalf of the Class)

356.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

357.    Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

358.    The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

359.    Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

360.    Additionally, Defendants have publicly admitted that they are liable for medical monitoring and have committed to providing medical monitoring in response to the Leak.

361.    As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

### PRAYER FOR RELIEF

362.    Plaintiffs and Class members seek the following relief:

    a.    All compensatory damages and other damages as alleged herein;

    b.    Medical monitoring for Plaintiffs and the Class members;

    c.    Punitive damages where allowable;

     d.     Pre- and post-judgment interest as allowed by law;

     e.     A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

     f.     Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

     g.     Equitable and injunctive relief including:

     i.     Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

     ii.     The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

     iii.     Provision of full water supply for all homes in the Class;

     iv.     Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

     v.     Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

     vi.     Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

     h.     All other relief this Court deems necessary, just and proper.

## **DEMAND FOR TRIAL BY JURY**

363.     Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: June 4, 2025                    Respectfully submitted,


                                       */s/ Shanon J. Carson*_____
                                       Shanon J. Carson (Bar No. 85957)
                                       Y. Michael Twersky (Bar No. 312411)
                                       Joseph E. Samuel, Jr. (Bar No. 327645)
                                       **BERGER MONTAGUE PC**
                                       1818 Market Street, Suite 3600
                                       Philadelphia, PA 19103
                                       Telephone: 215-875-4656
                                       Email: scarson@bm.net
                                       Email: mitwersky@bm.net
                                       Email: jsamuel@bm.net

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on this day a true and correct copy of the foregoing

was filed with the Court's ECF system, which served all counsel of record.

Dated: June 4, 2025                              Respectfully submitted,


                                                 *<u>/s/ Shanon J. Carson</u>*_____
                                                 Shanon J. Carson